**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **VENETTA A. OUTLEY**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15 C 7817 |
| | ) | |
| **CAROLYN W. COLVIN**, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Venetta A. Outley ("Outley") seeks judicial review pursuant to the Social Security Act

(the "Act"), more specifically 42 U.S.C. §§ 405(g) and 1383(c)(3),[1] of the final decision by

Acting Commissioner of Social Security Carolyn W. Colvin ("Commissioner") that denied

Outley's claims for disability insurance benefits under Titles II and XVI of the Act. Each of

Outley and Commissioner seeks summary judgment under Fed. R. Civ. P. ("Rule") 56:

1.     Outley asks for the reversal of Commissioner's decision, with an award of

 benefits to Outley, or alternatively for a remand of the case for further

 proceedings.

2.     Commissioner seeks affirmance of her denial of benefits.

For the reasons given in this memorandum opinion and order, Outley's motion is denied in part

and granted in part, while Commissioner's motion is denied, and the case is remanded for further

proceedings consistent with this opinion.

---

[1] All further statutory references will take the form "Section --," using the Title 42 numbering rather than the Act's internal numbering. All portions of 20 C.F.R. will be cited "Reg. § --," with references to its Part 404 provisions omitting the prefatory "404."

Outley applied for social security disability insurance benefits ("SSDI") under Title II of the Act on June 21, 2011, alleging a disability onset date of December 31, 2010 (R. 186, 203). That application was denied on October 14, 2011 and again denied on reconsideration on March 9, 2012 (R. 14, 101, 102). On May 14, 2012 Outley requested a hearing (R. 262), and on September 26, 2012 she augmented her application for SSDI with one seeking supplemental security income ("SSI") under Title XVI of the Act (R. 268-69). Administrative Law Judge B. Carlton Bailey, Jr. ("ALJ Bailey" or simply "the ALJ") held the requested hearing on July 17, 2013 and issued a decision denying Outley's applications for benefits on February 13, 2014 (R. 11, 36). Outley requested review from the Appeals Council, but it denied that request on July 6, 2015 (R. 1). Thus ALJ Bailey's opinion represents Commissioner's final decision.

**Medical Records**

Several sources provided medical records to the Social Security Administration ("SSA"), of which only the ones relevant to the portions of the ALJ's opinion that Outley is contesting will be recited. Outley's primary care physician, Dr. Percy Conrad May, submitted his treatment notes in three waves on July 23, 2011, February 7, 2012 and June 17, 2013 covering the period from November 9, 2009 through June 30, 2012, plus one letter and a prescription dated July 10, 2013.[3] West Suburban Medical Center ("West Suburban") also submitted its notes in three stages related to hospitalizations (1) on March 8, September 26, September 27, October 7 and

_____

[2] Citations to the administrative record take the form "R. --." This opinion refers to the parties' appellate memoranda as "Mem. --" or "Reply --" as appropriate and to the supplemental memoranda this Court solicited on July 7, 2016 as "Supp. Mem. --", with identifying prefixes of "O." for Outley and "C." for Commissioner.

[3] Dr. May also submitted an assessment of Outley's residual functional capacity ("RFC"), which will be described below in the context of medical opinions.

October 8, 2010, (2) on August 18, 2011 and (3) on February 19, July 7 and July 8, 2013. Lastly, physicians and chiropractors at Integrity Medical Group ("Integrity") provided their treatment notes and evaluations concerning Outley's rehabilitation therapy from July 16 through September 28, 2012 following an automobile accident on July 10 of that year.

Relevant to her present review action, Outley saw Dr. May on January 1, 2010 complaining of a chronic cough and back pain that had not gotten better with medication (R. 308). He attributed the back pain to degenerative disc disease and lumbago and recommended that she stay home from work for the next two weeks (R. 311-12).

After three to four days of acute back pain that made it difficult to walk, Outley went to West Suburban's emergency room on March 8, 2010 (R. 367). She was given pain medication and discharged (R. 363).

On June 15, 2010 she again saw Dr. May in "[r]espiratory distress," having been short of breath for the previous two weeks (R. 312). His only relevant diagnosis was benign hypertension, but he nonetheless provided an out-of-work note for June 12-16 (R. 316-17).

Outley went to the emergency room at West Suburban again on September 26, 2010 complaining of slurred speech, swelling in her cheek and pain in her neck and back (R. 358-59). Computerized tomography of the brain revealed no acute intracranial process (R. 361). Outley was diagnosed with angioedema and hypertension before being discharged (R. 358). Next day she returned, saying that she had not gotten better, with pain in the center of her chest and unable to catch her breath, especially with exertion (R. 350). Diagnostic imaging of her chest revealed no acute cardiopulmonary process, and so she was discharged (R. 346, 353).

Outley went to the West Suburban emergency room again on October 7, 2010 because she felt heavy across her anterior chest and had been short of breath intermittently since her

September 26 visit (R. 377).  But the emergency room staff was unable to diagnose her with anything more specific than chest pain, saying that inpatient care would be needed for further evaluation (R. 376).  So Outley returned the following day, complaining of chest pain that had been bothering her on and off for the last ten days and was accompanied by shortness of breath (R. 369).  At that time she reported that she was independent in performing her activities of daily living (R. 369).  Among her medications was Albuterol, taken as needed (R. 369).  After ruling out any acute cardiopulmonary process, the examining physician attributed her symptoms to bronchitis with costochondritis (R. 370).

Outley followed up three days later with Dr. May, who diagnosed her with chronic obstructive pulmonary disease ("COPD") and added Qvar to her medications (R. 25).  On November 10, 2010 Dr. May ordered a spirometry test -- the results of which are not indicated (R. 322) -- and continued her medication for COPD (R. 325-26).  During a June 15, 2011 visit for stomach pain she told Dr. May that she had not experienced shortness of breath or wheezing, but she did note increasing back pain, which was again attributed to her degenerative joint disease (R. 334, 338).  Dr. May also added Advair to Outley's prescriptions (R. 338).

Outley went to West Suburban's emergency room again on August 18, 2011 for shortness of breath (R. 419).  After radiologists found no acute pulmonary process (R. 427-29), she was diagnosed with an acute upper respiratory infection and acute costochondritis before being discharged (R. 421).

She saw Dr. May again on October 21, 2011 complaining of back pain that, she said, made it difficult to get out of bed or stand for more than 5 minutes (R. 403).  He prescribed a Flovent inhaler and Savella for her pain (R. 407).

On February 1, 2012 she again visited Dr. May complaining of back pain and shortness of breath among other things (R. 394). He prescribed ProAir, Savella and Symbicort (R. 396-97).

Outley followed up with Dr. May on May 12, 2012 after she had gone to the emergency room for chest pains (R. 511).[4] At her visit she noted that she continued to be short of breath and had chest pain on and off for the preceding six months (R. 511). But she denied back pain (R. 511). Dr. May refilled her prescription for Symbicort to help with COPD symptoms, in addition to diagnosing her with hypertension and gastroesophageal reflux disease (R. 513-14).

At a June 29, 2012 office visit with Dr. May Outley complained, among other things, of fatigue, blurred vision, chest pain, lightheadedness, shortness of breath, difficulty breathing even while lying down, wheezing, back pain and tingling (R. 522). Her pulse was 113 beats per minute with a tardus rhythm (R. 524). She rated her back pain as greater than 6/10 (R. 521). Dr. May diagnosed her with hypertension, depression, supraventricular tachycardia and lumbar radiculopathy (R. 525).

Then on July 10, 2012 Outley was involved in a motor vehicle accident that exacerbated her degenerative disc disease (R. 19, 84, 441). She went to West Suburban the following day,[5] and she continued her recovery with Integrity beginning on July 16 (R. 441). Over the course of her treatment she was given a straight-leg raise test at Integrity four times, with negative results on August 14 (R. 458), August 31 (R. 449) and September 4 (R. 447) and a notation by Dr. Johnson that the test caused lower back pain bilaterally on July 16 (R. 482). Magnetic resonance imaging ("MRI") on her cervical spine revealed broad-based disc protrusions and

_____

[4] No medical records pertaining to that visit appear in the administrative record.

[5] Records pertaining to that visit are also missing from the administrative record.

moderate to severe neuroforaminal and central canal stenosis from the C3-C4 through C7-T1 levels, while an MRI of the lumbar spine showed a broad based disc bulge at L5-S1 and minimal disc bulging at L3-L4 and L4-L5, both without stenosis (R. 454).

Outley saw Dr. Gregory Iavarone ("Dr. Iavarone") at Integrity for chiropractic therapy 11 times between July 17 and September 27, 2012 (R. 445-46, 451-53, 460, 464, 468-69, 477-78). At a September 25 visit Outley reported that her lower back pain had improved, but she still rated it 5/10 (R. 446). Two days later she again rated her back pain at 5/10 (R. 445).

Those reports of pain contrast with Integrity's final evaluation of Outley's back and neck trauma prepared by Dr. Claudia Johnson on September 28, 2012 (R. 441-44). On that day Outley reported very little pain -- 1 out of 10 -- in part due to epidural injections she had received (R. 441). Dr. Johnson measured her ability to move at the spine but did not draw any conclusions about what those measurements indicated as to Outley's physical capabilities (R. 443). Those measurements for Outley's cervicothoracic spine were 40 degrees forward flexion, extension of 28 degrees with mild stiffness and discomfort at end range, and 68 degrees left and right rotation with pain at end range (R. 443). For her lumbosacral spine, Outley's lumbar flexion was 8 inches fingertips to floor with pain, extension was 26 degrees with slight pain at end range and both left and right rotation were 20 degrees (R. 443). Dr. Johnson also noted a Grade I myospasm in the lumbar paraspinal musculature (R. 443). Stating that Outley had reached maximum medical improvement, Dr. Johnson discharged her from treatment (R. 441).

In the course of reciting Outley's medical history, Dr. Johnson stated that Outley had suffered a previous cervical and lumbar injury, but that it had resolved completely before the

accident and that she had been pain-free (R. 442). Among Outley's medications was Albuterol (R. 442).

Outley went to the emergency room at West Suburban on February 19, 2013 with chest pain, but left without being seen (R. 553-54). Chest pain sent her to the hospital again on July 7, 2013, where she was given acetaminophen and discharged to follow up with Dr. May (R. 539, 541-42). She returned to West Suburban the following day again complaining of chest pain, but again left before being seen (R. 536).

On July 10, 2013, Dr. May wrote a brief letter addressed "To Whom It May Concern" (R. 531). It said simply that Outley was under his care and that "[h]er condition has not improved, and in fact has deteriorated" (id.). He gave her a prescription for Oxycontin that same day (R. 533).

**Outley's Stated Symptoms**[6]

As part of her initial SSDI application Outley completed a Function Report and a Physical Impairments Questionnaire (collectively the "2011 Function Report"). There she relayed that the issues with her spine made it difficult to move (R. 215), noting that the pain sometimes (but not always) interfered with her ability to care for herself (R. 216). Though she did not drive (R. 218), she went to church 2 to 3 times per month (R. 219). She said she could lift 5 to 10 pounds and walk about half a block before resting (R. 220). Aside from frequently being short of breath, her physical complaints almost exclusively involved those related to walking, bending, squatting and other activities related to the spine (see R. 220-21, 225). She also stated that her arthritis often made it difficult to use a can opener, open jars or pick up a coin

---

[6] Reg. § 404.1528 defines "symptoms" as the claimant's own description of his or her impairment, "signs" as observable abnormalities and "laboratory findings" as phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques.

(R. 224) and that her fingers sometimes cramped holding a pencil or pen (id.). She said that her fatigue interfered with sorting and filing papers or reading a newspaper or book (R. 224), and it was brought on by "stirring around" (R. 225). And her back issues restricted her ability to reach above her waist, carry groceries, enter or exit a car, get up from a chair or sit for more than two hours at a time (R. 224-25).

When Outley requested reconsideration in December 2011, she communicated that her condition had worsened and that as a result she had difficulty using her arms and hands (R. 232). Outley also had her daughter complete a new Function Report and Physical Impairments Questionnaire for her on February 7, 2012 (collectively the "2012 Function Report"), which again noted that her pain caused her difficulty with dressing, getting out of the bath tub, caring for her hair and using the lavatory (R. 239). She reported that she no longer prepared her own meals nor did any household chores (R. 240). She no longer went grocery shopping (R. 241). She had stopped going to church and no longer spent time with others (R. 242).

At the ALJ hearing on July 17, 2013 Outley testified concerning her symptoms and impairments. She said that work had become very difficult before she lost her job in customer service because she would often run out of breath before finishing a sentence, she had trouble sitting and her hands and feet would become swollen (R. 50). She claimed that pain kept her home almost every week, although not always with the same kind of pain (R. 51). She often had trouble sleeping, she claimed, but she did not have the money to visit the doctor regularly or to afford the medication that was prescribed (R. 54).

On the day of the hearing Outley claimed that her pain was primarily in her neck, chest, spine and down her left leg and that her feet and hands were swollen (R. 54). She stated that her pain was usually at a high level but would ebb after a time (R. 54). At other times her lumbar

spine rather than her cervical spine would hurt (R. 55). Her pain could be like pins and needles, sharp or a dull ache, but in her feet it was almost always pins and needles (R. 55). She also denied that her current pain medication was helping (R. 61-62, 63-64).

As to her daily activities Outley testified that her daughter needed to come by every day to help her take a bath and that Outley herself could not do any housework other than wash an occasional dish (R. 55, 56). In response to the question whether she did light cooking, she responded that she could use the microwave (R. 55-56). She would shop for groceries with her daughter's assistance, but her daughter had suggested just doing it herself (R. 56). Outley said she went to church a few times a month, but she could not walk more than a block and a half before she started to run out of breath and have pain in her legs (R. 56). Talking for long periods of time would also leave her winded (R. 68). She always had one of her daughters by her side to help her (R. 57).

### Medical Opinions

Outley was given a consultative examination by Dr. Liana Palacci on August 30, 2011 (R. 380-83). Dr. Palacci spent a total of 42 minutes with Outley while reviewing the records from Dr. May and preparing her report (R. 380). She noted that Outley used her Albuterol inhaler twice a day but had not needed a course of Prednisone (R. 380). Outley was not in acute distress on the day of the examination and was able to speak in full sentences (R. 381). Dr. Palacci heard nothing irregular in her heart rhythm or her lungs (R. 382). She noted that Outley could walk without seeming to compensate for pain, her grip strength was normal and she could make fists and oppose her fingers (R. 382). There was no diminished range of motion in Outley's hips, knees, ankles or cervical spine, and a straight-leg raise test was negative (R. 382). Outley's range of motion in her lumbar spine, however, was 70/90 degrees flexion and 25/25 degrees extension (R. 382). Dr. Palacci's clinical impressions were that Outley had

- 9 -

well-controlled asthma and hypertension, a history of pancreatitis and complaints of lower back pain (R. 383).

Dr. Towfig Arjmand reviewed Dr. Palacci's consultative examination report, Dr. May's treatment notes and the hospital records from West Suburban but did not examine Outley himself, and he then completed a Physical Residual Functional Capacity Assessment (the "Arjmand Assessment") on October 13, 2011 (R. 101, 104, 385-92). As to Outley's symptoms, Dr. Arjmand said her statements were only "partially credible" on the basis of the fact that Dr. Palacci had noted a normal grip strength and the ability to both make a fist and oppose her fingers, thus undermining what Outley had said about her hands, which Dr. Arjmand's paraphrase presented as a persistent rather than occasional problem (id. at 390).

But Dr. Arjmand did conclude that Outley's medically determinable impairments could be expected to produce some limitations that restricted her to light work (R. 387, 390). Specifically, the Arjmand Assessment stated that Outley could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand or walk for 6 hours a day, sit for 6 hours a day and push or pull without limitation (R. 386). No postural or manipulative limitations were indicated (R. 387-88), but Outley's asthma and cardiovascular conditions meant that she should avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, gases and poor ventilation (R. 389). In support Dr. Arjmand cited Dr. Palacci's clinical impressions, her range of motion findings, the negative result of the straight-leg raise test and the grip strength test result (R. 386-87). Also recited were (1) West Suburban's treatment notes stemming from Outley's October 8, 2010 hospitalization, which had found that her chest pain and shortness of breath were attributable to bronchitis and costochondritis rather than to any acute

cardiopulmonary process, and (2) Dr. May's treatment notes concerning her blood pressure and medications (R. 386-87).

Dr. May completed a Physical Residual Functional Capacity Questionnaire of his own on February 3, 2012 (R. 438-40, the "May Assessment"). In it he stated that he had been treating Outley for the last 15 years (R. 438). He diagnosed her with COPD, lumbago and radiculopathy, indicating expiratory wheezing and a positive straight-leg raise test (R. 438). He said that Outley's pain medications made her too sleepy to work (R. 438). In opining as to the effect her impairments would likely have, he said that she could sit for no more than 2 hours at a time and stand for no more than 20 minutes, and so she would need a job that permitted her to shift positions at will from sitting, standing or walking (R. 438-39). She would need daily unscheduled breaks of 10 to 20 minutes and would miss on average three days per month (R. 439-40).

Once Outley sought reconsideration of the initial denial of her claims, her materials were reviewed by Dr. Charles Wabner on March 8, 2012 (R. 433). In a single-paragraph explanation (the "Wabner Assessment") he remarked that the accounts of Outley's daily activities were not significantly different from those in her initial applications, although he did not describe those accounts in any detail, and so he discounted the idea that her symptoms had worsened (R. 433). Without explanation he said that the new medical evidence did not alter the credibility finding Dr. Arjmand had made (R. 433). It is not clear when Dr. May submitted his assessment (which bears only its date of authorship), but in any event Dr. Wabner stated that no medical source statement was received and thus no controlling weight was given to it (R. 433; see also R. 110). Incorporating the signs and laboratory results stated in the Arjmand Assessment, the Wabner Assessment added only that Dr. May's updated treatment notes showed that Outley's blood

pressure remained around 160/90 and that some slight swelling had been detected on her back due to lumbago (R. 433). On that basis Dr. Wabner affirmed the Arjmand Assessment's conclusions.

Dr. Hilda Klein Martin provided testimony (the "Martin Assessment") as to Outley's medical records and RFC at the July 17, 2013 ALJ hearing (R. 36). Dr. Martin testified that Outley had degenerative disc disease, but she opined that Outley's asthma was not severe (R. 71, 79). As to asthma Dr. Martin noted that no doctor had heard wheezing (although Outley had reported it to them), that her attacks had never sent her to the hospital and that she was being treated with Qvar and Advair rather than Prednisone (R. 79). She said that Outley's 2012 automobile accident had made her lower back pain worse, noting a history of continuing lower back pain both before and after that accident (R. 83-85). Although Outley complained of radiculitis, Dr. Martin said that radiculopathy was not supported by a positive straight-leg raising test (R. 84-85). She explained that the positive straight-leg raising with lower back pain that Dr. Johnson had reported differed from a positive straight-leg raising positive for radiculopathy, and so it was negative in that sense (R. 74).

On the basis of the record Dr. Martin opined that Outley could lift and carry 20 pounds occasionally, do the same with 10 pounds frequently, stand and walk for six hours, sit for six hours and occasionally push or pull with her upper extremities (R. 82). Dr. Martin further excluded the use of ropes, ladders and scaffolds, said that Outley could occasionally stoop and crouch but not crawl, and she limited Outley to reaching overhead frequently rather than constantly (R. 82). She recommended that Outley not work in an environment with concentrated cold, concentrated vibrations, slippery or uneven surfaces, concentrated respiratory irritants,

rapid unguarded moving machinery and unprotected heights (R. 82-83). Dr. Martin also recommended excluding commercial driving from Outley's RFC (R. 83).

**ALJ Opinion**

ALJ Bailey found that Outley met the insured status requirements of the Act through December 31, 2015 and had not engaged in substantial gainful activity since December 31, 2010, her alleged onset date (R. 16). He found that before the July 10, 2012 auto accident Outley's only severe impairment was asthma, but that the accident had exacerbated her degenerative disc disease to the point that it too was a severe impairment (R. 16).[7] ALJ Bailey also found that Outley did not have an impairment or combination of impairments equivalent in severity to one of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (R. 18).

In assessing Outley's RFC the ALJ made an adverse credibility determination and afforded little weight to the May Assessment. Although finding that Outley's conditions could reasonably be expected to cause the symptoms of which she complained, the ALJ discounted her statements concerning the intensity, persistence and limiting effects of those symptoms (R. 19). And he justified his discounting of the May Assessment on the grounds that it was based on Outley's subjective reports rather than on objective findings and that it appeared to be a sympathetic opinion (R. 27). By contrast, the ALJ afforded great weight to the Arjmand, Wabner and Martin Assessments (R. 25-26, 28).

Thus ALJ Bailey found that Outley's RFC was exactly as described in the Martin Assessment, except with the additional limitation that she work in a low-stress job with relaxed or flexible production rate requirements (see R. 18). Because the vocational expert had testified

---

[7] Outley says nothing to contest the ALJ's determination that the other impairments that she alleged were not severe, and so -- thank goodness!! -- they need not be recited.

that Outley's RFC qualified her to work as an office helper or mail clerk, the ALJ found that she was not disabled (R. 29).

## **Standard of Review and Applicable Law**

This Court reviews ALJ Bailey's opinion as Commissioner's final decision, considering its legal conclusions de novo (Haynes v. Barnhart, 416 F.3d 621, 626 (7th Cir. 2005)). By contrast, factual determinations receive deferential review, so that courts may not "reweigh the evidence or substitute [their] own judgment for that of the ALJ" and will affirm Commissioner's decision "if it is supported by substantial evidence" (id.). Substantial evidence is "more than a mere scintilla," but rather "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks omitted)).

Credibility determinations receive even more deferential review. Courts can reverse or vacate an ALJ's credibility findings only when the findings are "patently wrong" (Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008)). Still, ALJs commit reversible error when they ground their credibility determinations upon "errors of fact or logic" (Allord v. Barnhart, 455 F.3d 818, 821 (7th Cir. 2006)).

As such cases as Haynes, 416 F.3d at 626 (internal quotation marks and citation omitted) teach:

> In rendering a decision, the ALJ must build a logical bridge from the evidence to his conclusion. The ALJ need not, however, provide a complete written evaluation of every piece of testimony and evidence.

Nonetheless an ALJ "cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding" (Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010) (per curiam)).

Hence "[i]f the Commissioner's decision lacks adequate discussion of the issues, it will be remanded" (Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009)). Rejection is also required if the ALJ has committed an error of law, regardless of how much evidence supports his or her factual findings (see Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997)). And Larson v. Astrue, 615 F.3d 744, 749 (7th Cir. 2010) has reiterated the long-standing rule going back to SEC v. Chenery Corp., 318 U.S. 80, 87-88 (1943) that only reasons that appear in an ALJ's opinion may be considered on review. But "we will nonetheless give the opinion a commonsensical reading rather than nitpicking at it" (Rice v. Barnhart, 384 F.3d 363, 369 (7th Cir. 2004) (internal quotation marks omitted)).

To qualify for benefits a claimant must be "disabled" within the meaning of the Act (Liskowitz v. Astrue, 559 F.3d 736, 739 (7th Cir.2009), citing Section 423(a)(1)(E)). Disability is defined in Section 423(d)(1)(A) as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[8]

To determine whether a claimant satisfies that definition, the ALJ must conduct the sequential five-step inquiry set forth in Reg. § 1520(a)(4) (Liskowitz, 559 F.3d at 740). In that inquiry the ALJ must determine (Dixon v. Massanari, 270 F.3d 1171, 1176 (7th Cir.2001)):

> (1) whether the claimant is currently employed, (2) whether the claimant has a
> severe impairment, (3) whether the claimant's impairment is one that the

_____

[8] Section 423 and 20 C.F.R. Part 404 govern SSDI claims, while Section 1382 and 20 C.F.R. Part 416 govern SSI claims. Typically the two statutes (like the two parts of the C.F.R.) use identical language, with some minor variations in wording that do not reflect substantive legal differences. For the sake of brevity this opinion will cite only to Section 423 and Part 404, except of course in instances where they materially diverge from Section 1382 (or from Sections 1382a, 1382b, 1382c, etc.) and Part 416, respectively.

Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work, and (5) whether the claimant is capable of performing any work in the national economy.

To receive disability benefits, an applicant for SSDI must also meet the insured-status requirements outlined in Section 416(i)(3). That means, for her SSDI claim only, that Outley must show she was under a disability after her alleged disability onset date of December 31, 2010 but before her insured status expired on December 31, 2015 (Reg. 131(a); Martinez v. Astrue, 630 F.3d 693, 699 (7th Cir. 2011)). But for Outley's SSI application she can establish disability at any time between her application date of September 26, 2012 and the present (see Reg. §§ 416.200, 416.202(g)).

### Evaluation of Outley's Symptoms

Reg. § 1529 calls for a two-step procedure in evaluating the impact of Outley's pain on her ability to work. First, the ALJ must determine that Outley actually does have a medical impairment that could reasonably be expected to produce her symptoms (Reg. § 1529(b)). If she does, the second step requires the ALJ to see if her statements about her pain are consistent with the rest of the record (Reg. § 1529(c)(4)). In so doing ALJs are instructed by Reg. § 1529(c)(2) to consider objective medical evidence, but not to discount a claimant's allegations solely because they are not substantiated by that evidence. As Reg. § 1529(c)(3) explains, "symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone." In addition, Villano, 556 F.3d at 562 (internal citation omitted) instructs:

> In determining credibility an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons.

Thus the ALJ must explain which symptoms were found to be consistent or inconsistent with the evidence and how evaluation of those symptoms led to the ALJ's conclusions (Social Security

Ruling ("SSR") 16-3p, 81 Fed. Reg. 14166, 14170, 2016 WL 1119029 at *8 (Mar. 16, 2016)).

Moreover, as Murphy v. Astrue, 496 F.3d 630, 634 (7th Cir. 2007) has reiterated, "an ALJ

cannot play the role of doctor and interpret medical evidence when he or she is not qualified to

do so."

     That two-step procedure used to be called a credibility determination and was afforded

special deference (see Jones v. Astrue, 623 F.3d 1155, 1160 (7th Cir. 2010)).  But in March 2016

the SSA rescinded its long-standing guidance on how to evaluate a claimant's symptoms

contained in SSR 96-7p, 61 Fed. Reg. 34483, 1996 WL 374186 (Jul. 2, 1996) and replaced it

with SSR 16-3p, 81 Fed. Reg. 14166, 2016 WL 1119029 (Mar. 16, 2016).  That change brought

SSA's subregulatory policy in line with its regulations, which do not speak in terms of

"credibility" (SSR 16-3p, 81 Fed. Reg. at 14167, 2016 WL 1119029 at *1).  In doing so,

SSR 16-3p, id. at 14171, 2016 WL 1119029 at *10 (emphasis added) clarified:

> Adjudicators must limit their evaluation to the individual's statements about his or
> her symptoms and the evidence in the record that is relevant to the individual's
> impairments.  In evaluating an individual's symptoms, our adjudicators will not
> assess an individual's overall character or truthfulness in the manner typically
> used during an adversarial court litigation.  The focus of the evaluation of an
> individual's symptoms should not be to determine whether he or she is a truthful
> person.  Rather, our adjudicators will focus on whether the evidence establishes a
> medically determinable impairment that could reasonably be expected to produce
> the individual's symptoms and given the adjudicator's evaluation of the
> individual's symptoms, whether the intensity and persistence of the symptoms
> limit the individual's ability to perform work-related activities.

     Somewhat surprisingly, Commissioner now contends that this Court should not defer[9] to

SSA's clarification of its own interpretive guidance as to what its regulations mean because SSR

_____

    [9]  As Liskowitz, 559 F.3d at 744 n.8 clarifies, the level of deference owed to SSR
interpretations of regulations is that articulated in Auer v. Robbins, 519 U.S. 452 (1997) and
Bowles v. Seminole Rock & Sand Co., 325 U.S. 410 (1945) -- under which they are "controlling
unless plainly erroneous or inconsistent with the regulation" (Auer, 519 U.S. at 461 (internal
(continued)

16-3p was promulgated after the ALJ's decision -- which must conform to the regulations -- became final (C. Supp. Mem. 1). But in arguing general principles that retroactivity is greatly disfavored, as to particulars Commissioner instead emphasizes the continuity between SSR 96-7p and SSR 16-3p (id. at 1-2).

That continuity would be fatal if this Court were to follow Outley's reliance (see O. Supp. Mem. 4) on Pope v. Shalala, 998 F.2d 473, 482-83 (7th Cir. 1993), which states that a court may ignore an agency's own designation of a new rule as a clarification (and thus just as applicable to decisions rendered before it was promulgated as is an intervening appellate court decision), rather than as a substantive change in the law (which must clear the hurdles en route to applying a law retroactively) only if the new regulation is "patently inconsistent" with the old. And SSR 16-3p, 81 Fed. Reg. at 14167, 2016 WL 1119029 at *2 expressly states that it is clarifying what ALJs must consider under SSA's regulations -- which regulations, it should be remembered, have not changed.

But SSRs do not have the force of law at all (see Lauer v. Apfel, 169 F.3d 489, 492 (7th Cir. 1999)). They are binding on SSA components (id., Reg. § 402.35(b)(1)), but as Lauer v. Bowen, 818 F.2d 636, 639-40 (7th Cir. 1987) (per curiam) held many years ago, they may be relied on as the SSA's interpretation of the statutes and regulations that define a claimant's rights only until they are expressly superseded, modified or revoked. Only with respect to enforcement actions brought against regulated entities that had acted in reliance on then-operative standards might there be an issue regarding retroactivity when it is just an interpretive rule that has

_____

(footnote continued)

quotation marks omitted)) -- rather than the one stemming from Skidmore v. Swift & Co., 323 U.S. 134 (1944).

changed (see <u>Perez v. Mortg. Bankers Ass'n</u>, 135 S. Ct. 1199, 1209 n.5 (2015)).  ALJs do not stand in the same shoes.

Almost as an afterthought, Commissioner concedes that SSR 16-3p might prohibit the sort of credibility determinations that have been upheld in the past, such as finding a claimant not to have been credible based on a felony conviction or on a general observation of her demeanor (C. Supp. Mem. 3 and n.1, citing <u>Butera v. Apfel</u>, 173 F.3d 1049, 1055 (7th Cir. 1999); <u>Powers v. Apfel</u>, 207 F.3d 431, 436 (7th Cir. 2000)).  But our Court of Appeals has been consistent in granting special deference to credibility determinations -- a level of deference to which Commissioner appeals here (C. Mem. 3-4) -- on the basis that "hearing officers are in the best position to see and hear the witnesses and assess their forthrightness" (<u>Powers</u>, 207 F.3d at 435; see also <u>Castile v. Astrue</u>, 617 F.3d 923, 929 (7th Cir. 2010); <u>Sims v. Barnhart</u>, 442 F.3d 536, 537-38 (7th Cir. 2006); <u>Diaz v. Chater</u>, 55 F.3d 300, 308 (7th Cir. 1995)).

On that score SSR 16-3p makes it plain that ALJs are to apply to the evidentiary record a set of factors enumerated in SSA regulations.  So long as substantial evidence supports what the ALJ determines after having done so, that determination cannot be second-guessed (see <u>Haynes</u>, 416 F.3d at 626).  But it is doubtful that ALJs still have much license to make credibility determinations of the sort that might be entitled to even more deference.

At first glance ALJ Bailey appears to have hewed to SSA regulations without relying on the seeming permission of SSR 96-7p to draw a general credibility determination, so there is no error of law in that respect.  Nor does his analysis suggest that he drew any conclusions at all from his own observations that might call for the level of deference reserved for credibility determinations.  While cast in the language of credibility (see R. 19), his justification plainly

goes through Outley's symptoms one by one and contrasts them with record evidence to call into doubt her statements about the effect her impairments have on her.

But as the ensuing discussion demonstrates, closer examination indicates that at several key points the ALJ was in fact arguing against the evidence on the basis of his own lay medical opinions or was simply misstating the record, rather than weighing or recounting it. And he did not adequately deal with Outley's statements about her day-to-day activities.

**<u>Back Pain</u>**

Thus ALJ Bailey contrasts Outley's allegation of intermittent back pain since 2004 with the fact that she has a normal spinal range of motion, that she told Dr. Johnson that she had been pain-free prior to her accident and that Dr. Palacci's consultative examination revealed only problems that had been resolved or that were well-controlled (R. 19-20). But while the ALJ provided citations in purported support of those contrasts, those citations do violence to the record.

For starters, Outley did not have a normal lumbar range of motion (R. 382, 443), a point the ALJ later conceded (R. 20, 22). In light of Outley's quite obvious diminished range of motion, it is incomprehensible that the ALJ cited Dr. Palacci's finding of diminished range to assert that Outley had a normal range of motion (see R. 382). And because portions of Dr. May's treatment notes are manifestly the result of a computer-prompted checklist, they cannot reasonably be read as reporting that he conducted a full test of Outley's range of motion and found no abnormality, when she actually came in for ailments unrelated to her back, such as influenza-induced diarrhea, chest pains, cold-like symptoms or stomach pains (compare R. 303,

318, 322, 334 with R. 306, 320, 325, 338).[10]  At issue is not a matter of the weight to be given to the evidence, but rather of understanding what the evidence actually conveys.

It is also difficult to imagine, given that Outley had been to the hospital for back pain repeatedly, why a solitary statement to Dr. Johnson in the context of whether a previous injury was still causing trouble is more indicative than every complaint of back pain to the contrary presented by the record.  At any rate, the ALJ provides no explanation. Later in the decision ALJ Bailey suggests Outley's back pain had largely resolved before the accident by noting that Outley denied back pain to Dr. May in May 2012 (R. 20; see R. 511), but he omits the fact that Outley sought treatment from Dr. May for back pain both before and after that denial on both February 1 (R. 12) and June 29 (R. 522).  Here again the ALJ did not so much weigh the evidence as cherry-pick from it.

And in opposing Dr. Palacci's consultative examination to Outley's assertions as to whether her problems were well-controlled, ALJ Bailey has implicitly ignored the statement of Dr. May -- a treating physician -- on the matter in favor of a non-treating source.  And in so doing ALJ Bailey did not subject Dr. Palacci's opinion to the analysis demanded by Reg. § 1527(c).

**Radiculopathic Pain**

Similarly, ALJ Bailey discounted Outley's repeated claims of radiculopathy by noting that the record revealed only one positive straight-leg raise test (R. 20).  Later he remarked in a different discussion that Dr. Martin had distinguished that positive result from a positive

---

[10]  In that respect, contrast the fast pulse and tardus heart rhythm noted in the vital signs section of the report of Outley's June 29, 2012 visit with the statement of "regular rate and rhythm" in the standardized part of that report (R. 522, 524).  Similarly, on October 21, 2011 Outley visited Dr. May complaining of back pain, while the standardized portion of the notes says that she denies back pain (R. 403-04).

straight-leg raise test for radiculopathy (R. 21), but that still leaves the fact that Outley's allegations were discounted solely because they were not substantiated by objective medical evidence -- a treatment contrary to the explicit imperative of Reg. § 1529(c)(2). After all, the ALJ's decision noted that treating physicians repeatedly diagnosed her with radiculopathy (R. 21, 22).

**Neck and Back Pain**[11]

So too with Outley's allegations of neck and back pain: In that area ALJ Bailey contended that those were not severe conditions before the accident by drawing his own conclusions about what (1) a failure to order particular treatments, (2) the presence of some tests but not others and (3) specific measurements assertedly indicate about the severity of her condition (R. 20-21). Only on a different issue -- the limitation that might be expected from someone with Outley's 2011 measurement of 70 degrees of lumbar flexion -- did ALJ Bailey refer to a doctor's interpretation of the data in determining the effect that Outley's pain had on her ability to work before the accident (R. 20) -- but reliance on only that measurement again ran afoul of Reg. § 1529(c)(2).

And ALJ Bailey's determination that Outley's spinal issues did not leave her disabled even after the accident seems to rest primarily on her asserted improvement with therapy. In that regard he cites (1) Dr. Johnson's final evaluation, (2) normal-range-of-motion findings in April 2013, (3) an emergency room diagnosis in July 2013 of chest pain but not a bad back and (4) the brevity of Dr. May's July 10, 2013 letter (R. 22-23).

---

[11] This opinion follows ALJ Bailey in treating Outley's allegations of back pain separately from her allegations of neck and back pain, but it should be noted that the ALJ's discussion of the latter seemed to focus on the impact Outley's automobile accident had on her degenerative disc disease.

But it is difficult to understand the basis on which the ALJ considered Outley's statement to Dr. Johnson on September 28, 2012 that her pain was 1 out of 10 to be indicative of a full recovery rather than a good day, which is what the record actually conveys. By way of a sharp contrast, Dr. Iavarone had reported that Outley rated her pain at 5/10 both the day before and two days before her meeting with Dr. Johnson (R. 445-46). While chiropractors are not acceptable medical sources and cannot offer medical opinions (Pierce v. Colvin, 739 F.3d 1046, 1051 (7th Cir. 2014)), Outley's own statements about her pain are not medical opinions. And Outley reported pain significant enough to send her in search of medical attention after she supposedly recovered, reports that ALJ Bailey again discounted in violation of Reg. § 1529(c)(2) based solely on the lack of measurements substantiating that the pain was as bad as she indicated.

## Asthma

When the ALJ reached the question whether Outley's asthma has resulted in disabling limitations, he once again proceeded to play doctor. Exceeding what Dr. Martin had testified concerning the severity of Outley's asthma, ALJ Bailey speculated (R. 24-25 (citations omitted)):

> She does take prescription inhalant medications, Qvar and Advair. These are known as "maintenance" inhalers, rather than rescue inhalers. This indicates the claimant does not suffer acute symptoms on a regular basis, because if she were, then logically her doctor would prescribe a rescue inhaler. The claimant was started on Albuterol in October 2010 but that was due to a bout of bronchitis. Nothing indicates that she has been using Albuterol chronically or that she continued to receive prescriptions for Albuterol again.

Two points suffice for a response. First, as a matter of law the ALJ has engaged in precisely the sort of lay doctoring forbidden by Myles v. Astrue, 582 F.3d 672, 677-78 (7th Cir. 2009) (per curiam), which differs from this case only in that the ALJ there reached his own medical conclusions from the fact that the claimant had not been prescribed Insulin rather than Albuterol. Second, ALJ Bailey is simply wrong that Outley did not have a prescription for a rescue inhaler, for all the available medical records (see, e.g., R. 369, 396, 380, 442) include

prescriptions for Albuterol (or ProAir, which is the same thing -- see <u>Albuterol Oral Inhalation</u>, MedlinePlus (Feb. 15, 2016), https://medlineplus.gov/druginfo/meds/a682145.html).

**<u>Activities of Daily Living</u>**

ALJ Bailey's opinion is further flawed in characterizing the effect of Outley's impairments on her daily activities -- a factor that Reg. 1529(c)(3)(i) and <u>Villano</u>, 556 F.3d at 562 teach must be considered -- as "mild," stating (R. 17):

> [T]he claimant reported that she could cook simple meals, do some housework, shop for groceries in stores, pay bills, count change, go out alone, and follow written instructions very well.

But the degree to which Outley says she is prevented from performing daily maintenance tasks cannot support a finding that she was only mildly limited in that regard, and the ALJ pointed to no evidence suggesting that her daily activities were actually greater.

Especially instructive on that subject is the holding in <u>Clifford v. Apfel</u>, 227 F.3d 863, 872 (7th Cir. 2000) that "minimal daily activities, such as those in issue, do not establish that a person is capable of engaging in substantial physical activity."  Contrary to the ALJ's gloss on the record quoted in the last paragraph, the 2011 Function Report stated that Outley was mostly limited to making sandwiches or throwing a frozen dinner in the microwave (R. 217).  She said she could wash dishes but not sweep, mop, take out the trash or do any other housework that involved bending over (R. 217-18, 224), limitations that Bailey did not consider because he characterized her as being able to "do some housework" (R. 17).  Outley did go grocery shopping, but only about once per month (R. 218), and she had to have her daughter carry the bags (R. 224).  Hence the ALJ's description of her as able to "shop for groceries" (R. 17), which as stated implies a lack of impairment in that sphere, stretched the record impermissibly.  Nor did ALJ Bailey anywhere address Outley's allegations that she sometimes had difficulty dressing herself, bathing, caring for her hair or using the toilet (see R. 17).

Moreover, ALJ Bailey's statement that Outley is independent in her daily living cited an emergency room report from October 8, 2010 and the rest of his summary about what she can assertedly do was drawn exclusively from the 2011 Function Report (R. 17). But in doing so the ALJ does not appear even to have considered the significantly deteriorated condition described in Outley's 2012 Function Report or her testimony at the hearing. Also noticeably lacking is any explanation -- let alone a sufficient one -- of why an isolated statement made <u>before</u> the alleged onset date of her disability is to be taken as definitive as to her current condition, when her own statements about the time for which she claims an inability to work so plainly contradict it.

To be clear, the problems identified in this section are not mere disagreements with how ALJ Bailey weighed the evidence. On the contrary, the ALJ's failure to consider the record as a whole equate to a failure to weigh the evidence at all, and where he did weigh it he did so largely on the basis of his own lay medical opinions. Those errors are only compounded by the ALJ'S failure to consider all the factors required by SSA regulations or by his sole reliance on factors that SSA regulations deem insufficient.

## Weight Afforded to the May Assessment

Reg. 1527(c)(2) establishes what is known as the "treating physician rule," which as reiterated by <u>Roddy v. Astrue</u>, 705 F.3d 631, 636 (7th Cir. 2013) mandates:

> A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by objective medical evidence and not inconsistent with other substantial evidence in the record.

Such objective medical evidence must constitute more than a mere recitation of the claimant's subjective complaints (<u>Rice</u>, 384 F.3d at 370-71). But the contradictory opinion of a non-examining physician does not of itself suffice as the sort of substantial evidence that can knock

out an examining physician's opinion (Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003) (per curiam)).

As for the weight to be accorded to a treating physician's opinion, Scrogham v. Colvin, 765 F.3d 685, 697 (7th Cir. 2014), quoting Reg. § 1527(c)(2)-(5) (appellate court emendations omitted), has further explained:

> Even when an ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ is not permitted simply to discard it. Rather, the ALJ is required by regulation to consider certain factors in order to decide how much weight to give the opinion: (1) the "length of the treatment relationship and the frequency of examination," because the longer a treating physician has seen a claimant, and particularly if the treating physician has seen the claimant "long enough to have obtained a longitudinal picture" of the impairment, the more weight his opinion deserves; (2) the "nature and extent of the treatment relationship"; (3) "supportability," i.e., whether a physician's opinion is supported by relevant evidence, such as "medical signs and laboratory findings"; (4) consistency "with the record as a whole"; and (5) whether the treating physician was a specialist in the relevant area.

In terms of that standard, what follows next sets out substantial evidence to support the ALJ's determination not to give the May Assessment fully controlling weight.

While the May Assessment indicates a positive straight-leg raise test and expiratory wheezing, Dr. Martin noted -- and this Court's search confirms -- that neither such test appears in Dr. May's treatment notes (R. 79, 84-85). Dr. Martin further clarified that the only straight-leg raise test of note -- Dr. Johnson's July 16, 2012 result -- was not positive for radiculopathy and that the only notations as to wheezing reported Outley's complaints rather than anything that Dr. May detected himself (R. 74, 79). There is no doubt that Outley has severe impairments, but ALJ Bailey reasonably concluded that Dr. May's opinion as to their severity was based on Outley's own description of her symptoms rather than on any objective medical evidence.

That however should not necessarily control the outcome of the remand that the many defects in ALJ Bailey's handling requires. Whatever ALJ is assigned to preside over that remand

would do well to reconsider, or at least provide more explanation as to, the question whether the May Assessment should be afforded little weight. Nowhere does ALJ Bailey discuss -- as Reg. § 1527(c)(2)(i) requires him to consider -- the fact that Dr. May had been treating Outley for 15 years when he rendered his opinion (see R. 438). Commissioner attempts to pass that oversight off as harmless error, citing Henke v. Astrue, 498 Fed. App'x 636, 641 (7th Cir. 2012) and Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989). But Fisher, 869 F.2d at 1057 did not address an outright failure to follow SSA regulations. And while the nonprecedential order in Henke, 498 Fed. App'x at 640 n.3 did excuse a failure to discuss every Reg. § 1527(c) factor -- as did another case to which Henke, id. directs this Court's attention (Elder, 529 F.3d at 415-16) -- this Court observes that cases decided both before and after Henke have reiterated that an ALJ must discuss each of those factors after declining to accord a treating physician's opinion controlling weight (see Lehoullier v. Colvin, 633 Fed. App'x 328, 334 n.1 (7th Cir. 2015); Campbell v. Astrue, 627 F.3d 299, 308 (7th Cir. 2010); Larson, 615 F.3d at 751). Similarly, Scrogham, 765 F.3d at 697 & n.48 expressly refused to deem a failure to discuss all of the factors harmless error, especially as that failure prevented the court from assessing the reasonableness of the ALJ's decision in light of those factors.

Moreover, the inability to which Scrogham refers is compounded by the fact that the ALJ plainly held the May Assessment to a different standard than was applied to the opinions to which he ascribed great weight. Dr. Arjmand was a non-examining source who supported his conclusions only by reciting the medical evidence without linking it to those conclusions -- except with regard to his credibility determination, which (inasmuch as he discounted Outley's statements about her spine and asthma on the basis of a perceived conflict between her statement

that she sometimes had trouble picking up a pencil or holding a coin[12] (because she had good grip strength and could oppose her fingers) was plainly the sort of general character judgment that SSR 16-3p expressly forbids. Yet, notwithstanding the factors mandated by Reg. §§ 1527(1) and (3), ALJ Bailey afforded the Arjmand Assessment great weight based solely on the fact that it did not contradict other parts of the record (R. 25).

Similarly, Dr. Wabner was a non-examining source whose conclusions were supported tersely if at all. In addition, he plainly misstated the record in concluding that the 2012 Function Report did not show significant deterioration in Outley's ability to function on a day-to-day basis over the 2011 Function Report. Nonetheless ALJ Bailey afforded the Wabner Assessment great weight (R. 25-26).

Given all of those lapses, this Court cannot say that ALJ Bailey applied the correct legal standard in evaluating the May Assessment. It is a major understatement to say that the ALJ's opinion failed to build the required logical bridge between the record and his conclusions on that score.

### Vocational Assessment

This opinion need not address the parties' respective arguments as to whether the occupational demands of a mail clerk or office helper were beyond what the ALJ determined Outley's RFC to be. Because a new RFC assessment will have to be conducted for the reasons set out in length here, there is little point in speculating about the sort of work Outley may be able to perform.

---

[12] Even worse, he altered that statement in relaying it.

## Conclusion

Social Security cases form too small a component of this Court's docket to permit it even to consider the possibility of extrapolating all of the ALJ's major mishandlings of this case to a more generalized concern as to the handling of such cases at the administrative level. And as to ALJ Bailey in particular, it cannot be told whether this was simply a bad day on his part or whether there is cause for concern in more general terms. That however is a subject for the administrative branch rather than the judicial branch to determine.

In the same way, the selection of an ALJ to handle Outley's case on remand is for the Commissioner to decide. All the same, any regular reader of opinions from our Court of Appeals will recognize its continuing sharp criticism of the administrative handling of these cases, most often authored by (but not at all limited to) Judge Richard Posner. Although that court (and this Court as well) recognizes and respects the allocation of that responsibility to the Commissioner rather than to Article III judges, that court has frequently urged (and this Court has occasionally echoed its urging) that a substantial level of error the first time around calls for reassignment to a different ALJ on remand. This case is a prime candidate for such a reassignment.

Accordingly, for the reasons stated in this opinion both parties' motions for summary judgment -- Outley's (bearing no Dkt. No.) and the Commissioner's (Dkt. No. 21) -- are denied. Instead the Commissioner's final decision is reversed and remanded for rehearing pursuant to Sentence Four of 42 U.S.C. § 405(g).

Milton I. Shadur
Senior United States District Judge

Date: August 30, 2016